IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | | |
|---|---|---|
| SMOOTHIE KING FRANCHISES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 7:20-cv-36 |
| | § | |
| FIRSTFRUITS VALDOSTA, LLC, | § | |
| FIRSTFRUITS TIFTON, LLC, | § | |
| FIRSTFRUITS THOMASVILLE, LLC, and | § | |
| JEREMY PATE, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S VERIFIED COMPLAINT

Plaintiff Smoothie King Franchises, Inc. ("Smoothie King") files this Verified Complaint against Defendants and former franchisees FirstFruits Valdosta, LLC ("Valdosta"), FirstFruits Tifton, LLC ("Tifton"), FirstFruits Thomasville, LLC ("Thomasville") (collectively, "FirstFruits"), and Jeremy Pate ("Pate") (FirstFruits and Pate are collectively referred to as "Defendants") based on Defendants' violations of the Lanham Act, violations of a covenant against competition, breach of franchise agreements, breach of guaranty, and misappropriation of trade secrets.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Smoothie King is a Texas corporation that was originally incorporated in Louisiana in 1987 and redomesticated as a Texas corporation in 2018 with its principal place of business located at 9797 Rombauer Road, Coppell, Texas 75019.

2.      Defendant Valdosta, upon information and belief, is a Georgia Limited Liability Company with its principal place of business located in Valdosta, Georgia.  Service of process

on Valdosta can be made by serving its Registered Agent, Jeremy Pate, at 1200 Newnan Crossing Blvd. E, Apt. 1008, Newnan, Georgia, 30265.

3.    Defendant Tifton, upon information and belief, is a Georgia Limited Liability Company with its principal place of business located in Tifton, Georgia.  Service of process on Tifton can be made by serving its Registered Agent, Jeremy Pate, at 1200 Newnan Crossing Blvd. E, Apt. 1008, Newnan, Georgia, 30265.

4.    Defendant Thomasville, upon information and belief, is a Georgia Limited Liability Company with its principal place of business located in Thomasville, Georgia.  Service of process on Thomasville can be made by serving its Registered Agent, Jeremy Pate, at 1200 Newnan Crossing Blvd. E, Apt. 1008, Newnan, Georgia, 30265.

5.    Defendant Jeremy Pate, upon information and belief, is an individual residing in Georgia.  Mr. Pate may be served with process at 1200 Newnan Crossing Blvd. E, Apt. 1008, Newnan, Georgia, 30265.

6.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338, 15 U.S.C. §1121, and, with respect to certain claims, 28 U.S.C. §1367.

7.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(1) and (2) because Defendants reside in this judicial district and a substantial part of the events giving rise to these claims occurred in this jurisdiction.

## ALLEGATIONS COMMON TO ALL COUNTS

## THE SMOOTHIE KING MARKS

8.    Smoothie King is a national franchisor that offers franchises for the operation of Smoothie King Units.[1]  Since 1988, Smoothie King Units have been selling healthy, blended,

---

[1] The undefined capitalized terms used herein shall have the meanings assigned to them in the Franchise Agreements (each as defined below).

fruit drinks ("smoothies") made from confidential and proprietary recipes and blending techniques developed through considerable time, effort, and expense. Smoothie King Units also offer a wide selection of healthy snacks and high quality nutritional products. The Smoothie King Franchise System currently consists of over 1100 Units with over 950 Units in 33 states in the United States.

9.     The Units offer the original Smoothie King smoothies consisting of blends of real fruits, fruit juices, and fruit and vegetable purees combined with nutritional supplements, other blended products, and meal replacement items, that are custom made to order.  Units also offer consumers the benefit of nutritional retail merchandise, which includes: vitamins, herbs, minerals, a myriad of supplements, and nutritional snack items, among many other nutritional drinks and general nutrition products, at authorized locations throughout the United States, including Georgia, and in several foreign countries.

10.    To identify the source, origin and sponsorship of Smoothie King's facilities, products and services, Smoothie King has extensively employed, caused to be advertised, and publicized throughout the United States certain distinctive service marks and trademarks ("Proprietary Marks"), including its principal mark "SMOOTHIE KING®" (all collectively, the "Smoothie King Marks" or "Marks").

11.    Smoothie King was the first to adopt and use the Smoothie King Marks as trademarks and service marks, and all right, title and interest to the Smoothie King Marks and the design, decor and image of Smoothie King Units remain vested solely in Smoothie King.

12.    Smoothie King operates and franchises Smoothie King Units using the Smoothie King Marks on signs, menu boards, posters, uniforms, cups and other items, and in advertising to the public through television, radio and print media.

13.     Set forth below is an abbreviated listing of the Smoothie King Marks registered in the United States Patent and Trademark Office:

| Mark | Reg. No. | Reg. Date |
|------|----------|-----------|
| SMOOTHIE KING* | 1840792 | June 21, 1994 |
| SMOOTHIE KING & DESIGN | 2036826 | February 11, 1997 |
| SMOOTHIE KING & DESIGN | 4642119 | November 18, 2014 |

The SMOOTHIE KING & DESIGN Mark subject to Registration No. 4642119 is displayed below.



14.     The registrations of the Smoothie King Marks are currently in full force and effect, and Smoothie King has given notice to the public of the registration of the Smoothie King Marks as provided in 15 U.S.C. §1111.

15.     Pursuant to the Franchise Agreements between Smoothie King and its franchisees, Smoothie King grants its franchisees a limited license and authority to use and display the Smoothie King Marks, but only in such manner, and at such locations and times, as are expressly authorized by Smoothie King. In no event is a franchisee authorized to use the Smoothie King Marks after the expiration or termination of its franchise. Such unauthorized use is expressly prohibited under the terms of all Smoothie King Franchise Agreements, including Defendants' Smoothie King Franchise Agreements with Smoothie King.

16.     Smoothie King's products bearing the Smoothie King Marks are offered and sold in interstate commerce.

17.     Smoothie King has spent millions of dollars in the United States and abroad advertising and promoting the Smoothie King Marks and Smoothie King's services and products.

18.     The substantial investment made in the Smoothie King Marks has resulted in the creation of valuable goodwill for the Smoothie King Marks and for the Units, products, and services bearing those Marks. Smoothie King products and services have met with considerable approval and, as a result of Smoothie King's extensive sales, advertising, promotion, and publicity, the public is familiar with the Smoothie King Marks. The products and services associated with the Smoothie King Marks are understood by the public to be produced, marketed, sponsored, supplied by and/or affiliated with Smoothie King.

## THE SMOOTHIE KING SYSTEM

19.     Smoothie King has developed a comprehensive system for the establishment and operation of business offering nutritional drinks and general nutrition production (the "System") for all Smoothie King franchisees to protect the image of Smoothie King Units and to ensure uniform, high quality standards. The detailed specifications and procedures of the Smoothie King System are set forth in Smoothie King's confidential operations manual, other manuals and other writings issued by Smoothie King from time to time, such as quality control requirements maintained on Smoothie King's intranet (collectively, "Proprietary Materials").

20.     Every Smoothie King franchisee is required by its Franchise Agreement to operate its franchise in accordance with the specifications and procedures contained in the Franchise Agreement and the Proprietary Materials. The Proprietary Materials set forth in detail

the mandatory Smoothie King Unit operating standards, specifications and procedures, including rules governing areas such as food preparation and handling, cleanliness, health, sanitation, and quality and speed of service. In addition to these strict quality, service and cleanliness requirements, the Proprietary Materials prescribe specified training procedures to ensure that these requirements are met. The Proprietary Materials are confidential Smoothie King information which a franchisee is permitted to possess and use only during the term of the Franchise Agreement.

21.     Smoothie King offers a broad range of services to its franchisees in order to monitor and assist a franchisee's compliance with these standards, including training for various levels of personnel. This enables Smoothie King to safeguard the integrity of Smoothie King Units, the Smoothie King System, and the Smoothie King Marks.

22.     Integral to Smoothie King's compliance and assistance program are periodic inspections and consultations undertaken by Smoothie King personnel specially trained to observe and advise in all areas of Unit operating procedure. Pursuant to Smoothie King's Unit visitation process, action plans are issued after a Unit inspection is conducted. These action plans serve as a training opportunity for the franchisee and as a quality assurance process for Smoothie King to ensure that critical quality, service, and cleanliness standards are being met by the franchisee. Each Smoothie King Franchise Agreement confers upon Smoothie King the right to enter the Unit premises to perform this vital function.

23.     Smoothie King has expended time, money, and effort to establish a successful system for the establishment of businesses offering nutritional drinks and general nutrition products with valuable confidential business information. As a result of its substantial expenditures of money and effort in developing and implementing the Smoothie King System,

Smoothie King has established a high reputation and a positive image with the public as to the quality of products and services available at Smoothie King Units, which reputation and image have been, and continue to be, valuable assets of Smoothie King. Smoothie King strives to maintain that reputation through its careful selection of authorized franchise owners, facilities, and locations and its careful supervision over the manner and quality of its Units' services.

24.     As a result of Smoothie King's efforts, it has developed customer goodwill that has caused its business to increase from year to year.   Smoothie King derives independent economic value from the Smoothie King System being confidential and not readily ascertainable by other persons who might obtain economic value from its use or disclosure.  Smoothie King has taken and continues to take steps to prevent the disclosure of the Smoothie King System.

25.     Additionally, Smoothie King has through considerable time, effort, and expense, developed confidential and proprietary recipes and blending techniques for making healthful, blended, fruit drinks.  These recipes are not publicly known, and Smoothie King takes reasonable measures to protect the secrecy of these recipes.  Specifically, franchisees are required to sign confidentiality agreements in which they agree to maintain the confidentiality of the recipes and blending techniques.  Franchisees are further required to obtain confidentiality agreements from employees who will utilize the recipes to prepare the smoothies.  Additionally, a coding system has been implemented to protect the identity of the ingredients as well as the proportions of those ingredients in each recipe. Smoothie King's corporate offices and Research and Development lab keep the recipes under lock and key.  Smoothie King also prohibits the electronic transmission of its recipes.

26.     Defendants agreed that any and all recipes, ingredients or proprietary products, formulas, guest and supplier lists, product specifications and other information, knowledge,

techniques, and know-how, including any and all records and copies thereof in any form, which Smoothie King designates as confidential are confidential under Section 6.2 of the Franchise Agreements. Defendants further agreed that recipes, formulas, guest and supplier lists, product specifications, information, techniques and know-how developed, compiled or prepared by Defendants, their employees or agents and relating to the System or the operation of the Units are also confidential information under Section 6.3 of the Franchise Agreements.

## <u>SMOOTHIE KING'S AGREEMENTS WITH DEFENDANTS</u>

27.     Effective on March 5, 2013, Smoothie King and Pate entered into a franchise agreement, whereby Smoothie King granted Pate a franchise for the use of, among other things, Smoothie King's trade name, the Smoothie King Marks, the Smoothie King System, and other proprietary materials in the operation of a Smoothie King Unit (the "SK #1132" or the "Valdosta Unit") located in Valdosta, Georgia (the "Valdosta Franchise Agreement"). A true and correct copy of the Valdosta Franchise Agreement is attached as <u>Exhibit "A."</u>

28.     Effective on May 20, 2013, Smoothie King, Pate, and FirstFruits Valdosta, LLC entered into an agreement whereby Pate transferred the Valdosta Franchise Agreement to FirstFruits Valdosta, LLC ("Valdosta Transfer of Franchise Agreement"). A true and correct copy of the Valdosta Transfer of Franchise Agreement is attached as <u>Exhibit "B."</u>

29.     The Valdosta Unit's number, location, date of the Valdosta Franchise Agreement, and date of the transfer of the Valdosta Franchise Agreement are set forth below.

| Unit No. | Unit Location | Date of Valdosta Franchise Agreement | Date of Transfer of Valdosta Franchise Agreement |
|---|---|---|---|
| SK Unit # 1132 | 3219 N Oak Street Extension, Valdosta, GA 31605 | March 5, 2013 | May 20, 2013 |

30.     Pursuant to a written guaranty, dated May 20, 2013, Pate unconditionally personally guaranteed to Smoothie King the performance of each and every obligation of FirstFruits Valdosta, LLC under the Valdosta Franchise Agreement (the "Valdosta Guaranty"). A true and correct copy of the Valdosta Guaranty is attached as Exhibit "C."

31.     Effective on April 2, 2014, Smoothie King and Pate entered into a franchise agreement, whereby Smoothie King granted Pate a franchise for the use of, among other things, Smoothie King's trade name, the Smoothie King Marks, the Smoothie King System, and other proprietary materials in the operation of a Smoothie King Unit (the "SK #1255" or the "Tifton Unit") located in Tifton, Georgia (the "Tifton Franchise Agreement"). A true and correct copy of the Tifton Franchise Agreement is attached as Exhibit "D."

32.     Effective on September 23, 2014, Smoothie King, Pate, and FirstFruits Tifton, LLC entered into an agreement whereby Pate transferred the Tifton Franchise Agreement to FirstFruits Tifton, LLC ("Tifton Transfer of Franchise Agreement"). A true and correct copy of the Tifton Transfer of Franchise Agreement is attached as Exhibit "E."

33.     The Tifton Unit's number, location, date of the Tifton Franchise Agreement, and date of the transfer of the Tifton Franchise Agreement are set forth below.

| Unit No. | Unit Location | Date of Valdosta Franchise Agreement | Date of Transfer of Valdosta Franchise Agreement |
|---|---|---|---|
| SK Unit # 1255 | 406 Virginia Ave N, Tifton, GA 31793 | April 2, 2014 | September 23, 2014 |

34.     Pursuant to a written guaranty, dated September 23, 2014, Pate unconditionally personally guaranteed to Smoothie King the performance of each and every obligation of FirstFruits Tifton, LLC under the Tifton Franchise Agreement (the "Tifton Guaranty"). A true and correct copy of the Tifton Guaranty is attached as Exhibit "F."

35.     Effective on February 18, 2016, Smoothie King and FirstFruits Thomasville, LLC entered into a franchise agreement, whereby Smoothie King granted Thomasville a franchise for the use of, among other things, Smoothie King's trade name, the Smoothie King Marks, the Smoothie King System, and other proprietary materials in the operation of a Smoothie King Unit (the "SK #1418" or the "Thomasville Unit") located in Thomasville, Georgia (the "Thomasville Franchise Agreement"). A true and correct copy of the Thomasville Franchise Agreement is attached as Exhibit "G."

36.     The Thomasville Unit's number, location, and date of the Thomasville Franchise Agreement are set forth below.

| Unit No. | Unit Location | Date of Valdosta Franchise Agreement |
|---|---|---|
| SK Unit # 1418 | 14949 US Hwy 19 South, Suite A, Thomasville, GA 31792 | February 18, 2016 |

37.     Pursuant to a written guaranty, dated February 18, 2016, Pate unconditionally personally guaranteed to Smoothie King the performance of each and every obligation of FirstFruits Thomasville, LLC under the Thomasville Franchise Agreement (the "Thomasville Guaranty"). A true and correct copy of the Thomasville Guaranty is attached as Exhibit "H."

38.     The Valdosta Franchise Agreement, Tifton Franchise Agreement, and Thomasville Franchise Agreements are all collectively referred to as the Franchise Agreements ("Franchise Agreements"). The Franchise Agreements are governed by Louisiana law, pursuant to Section 26.1, "this Agreement takes effect upon its acceptance and execution by Franchisor in Louisiana and shall be interpreted and construed under the laws thereof, which laws shall prevail in the event of any conflict of law."

39.     The Valdosta Guaranty, Tifton Guaranty, and Thomasville Guaranty, are all collectively referred to herein as the Guaranties ("Guaranties").

40.     The Valdosta Unit, Tifton Unit, and Thomasville Unit, are all collectively referred to herein as the Units ("Units").

## DEFENDANTS' OBLIGATIONS UNDER THE FRANCHISE AGREEMENTS

41.     Smoothie King is recognized as a leading health and fitness smoothie franchise brand by trade publications, including *Franchise Times, QSR Magazine,* and *franchising.com.* Smoothie King is devoted to sourcing the highest quality products and ingredients for its System. With a mission to inspire people to live healthy and active lifestyles, and with more and more consumers demanding menu transparency and clean, wholesome options from the brands they interact with, Smoothie King has excelled at demonstrating that kind of authenticity and unwavering commitment to guests' health and wellness needs. To this end, pursuant to Section 10.3 of the Franchise Agreements, Defendants agreed to operate the Units in strict conformity with the methods, procedures, standards and specifications as established by Smoothie King in the Franchise Agreements, the Manuals or otherwise in writing as to standards, recipes, ingredients and procedures.

42.     Specifically, Section 10.3.6 of the Franchise Agreements includes the mandatory requirements for Defendants to purchase supplies and ingredients from Smoothie King's Approved Suppliers and no other supplier. The Approved Suppliers are a critical component in the operation of the Smoothie King Units, the Smoothie King System, and the goodwill associated with Smoothie King and the Smoothie King Marks. Smoothie King is devoted to ensuring that its franchisees use superior products to promote its reputation as a leading health and fitness smoothie brand. Smoothie King carefully selects and vets its Approved Suppliers to ensure consistency and quality. Moreover, Smoothie King has diligently inspected and tested the

Approved Suppliers' products to ensure that the products meet Smoothie King's standards and specifications for quality control, brand standards, and health and food safety.

43.     Pursuant to Section 10.1 of the Franchise Agreements, Defendants also acknowledged and agreed that abiding by every detail of the Smoothie King System was important to maintain the high and uniform operating standards in the Smoothie King System, to increase the demand for the services and products sold by all franchisees in the Smoothie King System, and to protect the reputation and goodwill of the Smoothie King Marks.

44.     Pursuant to Section 10.3.3 of the Franchise Agreements, Defendants agreed to, among other things, maintain the Units in a good, clean, attractive and safe condition at all times.

45.     Pursuant to Section 10.3.9 of the Franchise Agreements, Defendants agreed to, among other things maintain, at all times, such minimum stock levels of inventory, ingredients and supplies as Smoothie King prescribes in the Manuals or otherwise in writing.

46.     Pursuant to Sections 3.5 and 3.6 of the Franchise Agreements, Defendants were also obligated to make monthly payments to Smoothie King for operating fees and advertising fees as well as other fees. Specifically, the Franchise Agreements require Defendants to pay to Smoothie King a certain percentage of monthly gross sales for the preceding calendar month in return for the use of the Smoothie King System and the Smoothie King Marks. Additionally, the Franchise Agreements obligate Defendants to pay Smoothie King a certain percentage of monthly gross sales for the preceding calendar month in return for advertising, sales promotion, and public relations expenditures made by Smoothie King on behalf of the Smoothie King System. Section 14.4 of the Franchise Agreements provides that the failure to make such payments constitutes an act of default.

47.     Pursuant to Section 16 of the Franchise Agreements, in the event the Franchise Agreements are terminated, Defendants are required to comply with a number of post-termination obligations.

48.     Pursuant to Section 16.1 of the Franchise Agreements, Defendants agreed to "cease all operation of the Franchised Business and all use of the Proprietary Marks and the System."

49.     Pursuant to Section 16.1.1 of the Franchise Agreements, Defendants agreed to "[i]mmediately cease to operate the Franchised Business and at no time thereafter represent itself, directly or indirectly, as a current or former franchisee of Franchisor."

50.     Pursuant to Section 16.1.2 of the Franchise Agreements, Defendants agreed to "[i]mmediately and permanently cease to use, in any manner whatsoever, any confidential recipes, formulas, Smoothie King® proprietary products and other ingredients, guest and supplier lists, product specifications lists, methods, procedures, or techniques associated with the System, the name and mark "SMOOTHIE KING®" and all other Proprietary Marks and distinctive names, symbols, logos, insignia, slogans, graphics, and devices associated with the System, including all signs, advertising materials, displays, stationery, forms, and any other articles that display any of the Proprietary Marks. Franchisee shall also immediately discontinue any telephone listing under the Proprietary Marks upon request of Franchisor. Franchisee shall immediately assign to Franchisor any rights it has in any telephone number from which Franchisee has done business under the Proprietary Marks or discontinue the use of the number upon request of Franchisor."

51.     Pursuant to Section 16.1.3 of the Franchise Agreements, Defendants agreed to "[t]ake such action as may be necessary to cancel any assumed name or equivalent registration

that contains the name "SMOOTHIE KING®" or any of the other Proprietary Marks or any other name or mark used by Franchisor …."

52.     Pursuant to Section 16.1.4 of the Franchise Agreements, Defendants agreed to "[i]mmediately deliver to Franchisor or its designee the Manuals and all other materials relating to the operation of the Franchised Business, including, without limitation, plans, specifications, designs, records, data, samples, models, programs, training tapes, handbooks, drawings, records, recipe books, supplier lists, guest lists, product specification lists, files, invoices, instructions, correspondence, and all copies thereof, all of which are acknowledged to be Franchisor's property, and retain no copy or record of any of the foregoing except Franchisee's copy of this Agreement and such documents as Franchisee reasonably needs for compliance with any provision of law."

53.     Pursuant to Section 16.1.5 of the Franchise Agreements, Defendants agreed to "[p]romptly pay all sums owing to Franchisor, its subsidiaries, affiliates, and divisions."

54.     The Franchise Agreements also contain a covenant not to compete upon expiration or termination of the Franchise Agreements in Section 17.3.2, which provides that "Franchisee shall not, for a period of two (2) years after this Agreement expires or is terminated or the date on which Franchisee ceases to conduct the business franchised under this Agreement, whichever is later, directly or as an employee, agent, consultant, partner, officer, director or shareholder of any other person, firm, entity, partnership or corporation, own, operate, lease, franchise, conduct, engage in, be connected with, have any interest in, or assist any person or entity engaged in any business that distributes, markets or sells, at wholesale or retail, any nutritional drinks or general nutrition products or any other related business that is competitive with or similar to a Smoothie King® Unit that is located at the Unit location or within a five (5)

mile radius of the Unit or any other Smoothie King® Unit in existence or planned as of the time of termination or expiration of this Agreement."

55.     As set forth below, Defendants breached the Franchise Agreements by: (1) failing to operate the Units in compliance with the Smoothie King System requirements as set forth in the Franchise Agreements, Manuals and other writings; (2) failing to pay amounts when due for operating, advertising, and other fees for the Units; (3) failing to adhere to their post-termination obligations; and (4) failing to comply with the covenant not to compete.

## DEFENDANTS' DEFAULT AND TERMINATION

56.     The Franchise Agreements contain provisions regarding default and establishing the parties' rights and obligations in the event of a default by Defendants under the Franchise Agreements.

57.     Specifically, Sections 14.1 and 14.1.7 of the Franchise Agreements provide that Franchisee shall be in default and all rights to Franchisee under the Franchise Agreements shall terminate immediately upon written notice from Smoothie King if, among other things, Franchisee is involved in any act or conduct which materially impairs or otherwise is prejudicial to the goodwill associated with the name "Smoothie King®" or any of the Smoothie King Marks or the System.

58.     Contrary to Section 10.3.6 of the Franchise Agreements, Defendants have purchased ingredients and supplies from unapproved suppliers, including Walmart, without Smoothie King's approval or consent. On February 12, 2020, Defendants' agent, Tristan Steele, admitted to Smoothie King representative, Kevin King, that Defendants had been and were currently purchasing the majority of ingredients and supplies for their Units from unapproved suppliers. Additionally, Defendants' agent, Jo A. Pate, also admitted that Defendants were

purchasing ingredients from an unapproved supplier. Defendants' use of unauthorized suppliers and inferior products jeopardizes the health and safety of Smoothie King customers, negatively impacts the entire Smoothie King System, and undermines Smoothie King's strict attention and dedication to being a leading health and fitness smoothie brand.

59.     Upon notice of Defendants' use of unapproved suppliers and unauthorized products, Smoothie King immediately requested records from Smoothie King's approved supplier, Performance Food Group ("PFG"). PFG's records show that Defendants have not placed an order with PFG, Smoothie King's approved supplier, since October 21, 2019 (Valdosta Unit), November 6, 2019 (Thomasville Unit), and November 14, 2019 (Tifton Unit). Defendants' use of unapproved suppliers is a material breach of the Franchise Agreements and the System standards. This action puts at risk the health, sanitation, and safety of the Units, the Smoothie King System and, ultimately, Smoothie King consumers.

60.     Pursuant to Section 3.5 and 3.6 of the Franchise Agreements, Defendants agreed to make monthly payments to Smoothie King for operating fees and advertising fees as well as other fees. Defendants have failed to pay the required fees due to Smoothie King. At this time, the exact amount of past due fees is estimated to be at least $8,151.82 ("Past Due Amounts").

61.     As a result, by letter dated February 20, 2020, and in accordance with sections 14.1, 14.2, and 22.1 of the Franchise Agreements, Smoothie King sent Defendants a Notice of Termination and Operations Non-Compliance ("Notice and Termination") notifying Defendants of their gross and material breach of the Franchise Agreements and immediately terminating the Franchise Agreements. A true and correct copy of the Notice and Termination is attached as Exhibit "I." A true and correct copy of the estimated schedule of Past Due Amounts is included in the Notice and Termination on page 2.

62.     Pursuant to Section 22.1 of the Franchise Agreements, Smoothie King sent the Notice and Termination to the most recent address provided by Defendants. A true and correct copy of the Defendants' change of address is attached as Exhibit "J."

63.     Smoothie King also sent the Notice and Termination to Defendants address listed with the Georgia Secretary of State.

64.     Accordingly, the Franchise Agreements terminated pursuant to the Notice and Termination provided to Defendants effective February 26, 2020.

65.     Despite their explicit agreement to the contrary, Defendants have failed to comply with their post-termination obligations pursuant to Section 16.1 of the Franchise Agreements.

66.     On March 2, 2020, Smoothie King's private investigator visited the Valdosta Unit, Tifton Unit, and Thomasville Unit. True and correct copies of the investigator's report ("Report"), including photographs taken at the Valdosta Unit, Tifton Unit, and Thomasville Units on March 2, 2020, is attached hereto as Exhibit "K", pages 11-20 (Valdosta Unit), pages 2-8 (Tifton Unit), pages 8-10 (Thomasville Unit).

67.     Defendants have continued to use the Smoothie King Marks at the Valdosta Unit, Tifton Unit, and Thomasville Unit without Smoothie King's authorization or consent. In so doing, Defendants are infringing upon the Smoothie King Marks and breaching their explicit post-termination obligations under the Franchise Agreements. The visible Marks include, but are not limited to, exterior signage, as shown below:

**Tifton Unit**





**Valdosta Unit**





**Thomasville Unit**



68.     Defendants have also breached their post-termination obligations in Section 16.1.4 of the Franchise Agreements by failing to return the Proprietary Materials, including the Manuals, to Smoothie King. The Proprietary Materials contain, among other things, Smoothie King's confidential and proprietary business information, including recipes, ingredients, formulas, product specifications and other information, knowledge, techniques and know-how. Defendants expressly acknowledged in Section 6.4 of the Franchise Agreements that the unauthorized disclosure or use of any confidential element of Smoothie King's confidential and proprietary information "will cause [Smoothie King] irreparable injury."

69.     Defendants have also breached the covenant not to compete obligation in Section 17.3.2 of the Franchise Agreements by continuing to operate smoothie businesses at the Valdosta and Tifton locations of their former Smoothie King Units. *See* Exhibit "K."

70.    Indeed, when Smoothie King's private investigator visited the Tifton Unit, on March 2, 2020, it was still selling smoothies. *See* Exhibit "K" at page 2. Even worse, when the private investigator ordered Smoothie King's Slim-N-Trim Chocolate smoothie, she was told by the Tifton Unit employees that they had limited ingredients, but would attempt to imitate Smoothie King's Slim-N-Trim Chocolate smoothie. *Id.* The private investigator received the "imitated" smoothie as shown below:



71.    Smoothie King's private investigator also visited the Valdosta Unit, on March 2, 2020, and it was still selling smoothies. *See* Exhibit "K" at page 11. When the private investigator ordered Smoothie King's Keto Berry Champ smoothie, she was told by the Valdosta Unit employee that the Valdosta Unit did not have the Keto protein for the Keto Berry Champ

smoothie. *See* Exhibit "K" at page 11. The private investigator received a berry smoothie without the Keto protein, as shown below:



72.     Defendants' operation of smoothie businesses from their former Smoothie King Units is an explicit breach of the covenant not to compete provision under the Franchise Agreements. Even worse, Defendants' sale of smoothies with non-standard and unapproved ingredients (while still using the Smoothie King Marks) and their explicit attempt to make smoothies that "imitate" the Smoothie King smoothies devalues the Smoothie King brand and causes Smoothie King severe and irreparable harm.

73.     Upon information and belief, it appears that the Thomasville Unit is no longer in operation despite exterior signage containing the Smoothie King Marks, which remain visible. A

true and correct copy of the Report and photographs taken at the Thomasville Unit on March 2, 2020 is attached hereto at Exhibit "K" at pages 8-10.

74. Defendants further agreed that the violations of the confidentiality provisions and the covenants not to compete would result in irreparable injury to Smoothie King and that injunctive relief was appropriate as there is no adequate remedy at law.

75. Smoothie King has expended time, money, and effort to establish a successful System for the establishment of franchised businesses offering healthy, blended, fruit drinks and other nutritional products, all with valuable confidential business information. As a result of Smoothie King's efforts, it has developed customer goodwill that has caused its business to increase from year to year. Smoothie King derives independent economic value from the Smoothie King System being confidential and not readily ascertainable by other persons who might obtain economic value from its use or disclosure. Smoothie King has taken and continues to take steps to prevent the disclosure of the Smoothie King System.

76. As a direct and proximate result of Defendants' breach of their post-termination obligations and the covenant not to compete, Smoothie King has suffered and will continue to suffer damages, including lost profits, as well as extensive and irreparable injury, loss of goodwill, harm to its current and future business interests, and other damages for which there is no adequate remedy at law, unless and until Defendants are restrained from their present conduct. Smoothie King also has suffered additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation.

77. The restraint on competition is reasonably necessary to protect Smoothie King's present and potential business.

78. The restrictions comply with Louisiana law and are reasonably necessary to protect Smoothie King's investment of considerable time, expense, and resources in the development of the Smoothie King System.

## LIKELIHOOD OF CONSUMER CONFUSION AND DECEPTION

79. Defendants have not tendered to Smoothie King or removed all Smoothie King signs, logos, menu boards, posters, uniforms, cups, and other items bearing the Smoothie King Marks, name, symbols or slogans, or which are otherwise identified with Smoothie King Units and are located at the Units.

80. Defendants' continued use and display of the Smoothie King Marks or any items associated with the Smoothie King name, symbols, or slogans at the Units is without Smoothie King's license or consent, and has caused or is likely to cause mistake, confusion or deception in the minds of the public as to source, affiliation, and sponsorship. Upon seeing the familiar Smoothie King Marks, through Defendants' unauthorized use thereof, consumers will be deceived into believing that the products and services sold at the Units are made or supplied by Smoothie King, are prepared in the prescribed Smoothie King manner and compliant with Smoothie King's standards, are sponsored or endorsed by Smoothie King, and bear the Smoothie King Marks pursuant to Smoothie King's authority and permission. Such impressions are calculated to and will have a materially adverse influence on customers' purchasing decisions, inducing them to patronize the Units in reliance on the goodwill, reputation, and appeal of Smoothie King.

81. By reason of the foregoing, Smoothie King has suffered damages, in an amount presently unknown yet substantial. Smoothie King no longer is the source or sponsor of the Units and does not endorse the Units, or the products and services provided therein, has not authorized

Defendants to use the Smoothie King Marks to identify the terminated franchise facilities, products, or services, and has protested expressly against such use.

82.     By virtue of termination of the Units, Smoothie King is unable to oversee the nature and quality of the goods and services that Defendants provide at the Units.

83.     Smoothie King will suffer serious, immediate, and irreparable harm if Defendants' willful infringement of the Smoothie King Marks is not immediately enjoined. Smoothie King's goodwill and reputation will suffer drastically by virtue of the public's identification of Smoothie King with the management and operation of the Units. Smoothie King exercises strict quality control over every phase in the marketing of Smoothie King products and services, from specification of ingredients, to the supervision of food preparation and handling, to the maintenance of strict standards as to cleanliness, health, sanitation, and quality of service. The carefully nurtured image which Smoothie King now enjoys will be irretrievably injured by any association with the Unit, which no longer is subject to Smoothie King's control and supervision.

84.     Defendants' sale of products and services under the Smoothie King Marks at the Units poses an immediate threat to the distinct, exclusive image Smoothie King has created at great expense for its franchisees and System. Smoothie King Units, services and products are known by the Smoothie King Marks which are emblematic of their distinctive source. Smoothie King Units enjoy a special appeal to consumers which will be diluted by the existence of infringing Units with products and services bearing the distinctive Smoothie King Marks. The intangible, but commercially indispensable, value that the Smoothie King Units now enjoy will be severely undermined by the operation of the Units, which make unauthorized use of the Smoothie King Marks.

85.     Consumer confusion as to the source or sponsorship of a Unit bearing the Smoothie King Marks will be attended not only by an inevitable loss of product distinctiveness, image, and goodwill, but will also cause a diversion of sales from Smoothie King. The economic injury to Smoothie King resulting from such diversion is incalculable and, as such, is an additional source of irreparable harm.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
*Violations of the Lanham Act*
*(Against all Defendants)*

86.     Smoothie King realleges and incorporates herein by reference each of the factual allegations above as though fully set forth herein.

87.     Smoothie King owns the Smoothie King Marks, and the Smoothie King registered trademarks are registered on the Principal Register of the United States Patent and Trademark Office.

88.     Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), provides that "[a]ny person who shall, without the consent of the registrant – use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant."

89.     Since the termination of the Franchise Agreements Defendants have continued to use the Smoothie King Marks at the Units. Such use has caused confusion or mistake among prospective or actual customers, in violation of Paragraph 32 of the Lanham Act.

90.     Paragraph 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides that "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion or to cause mistake, or to deceive as to affiliation . . . or as to the origin, sponsorship, or approval of . . . goods [or] services . . . shall be liable in a civil action."

91.     Defendants' actions in continuing to use the Smoothie King Marks at their former Smoothie King Units post-termination constitute:

        a.     a false designation of origin;

        b.     a false and misleading description of fact; and

        c.     a false and misleading representation of fact

that has caused and is likely to continue to cause confusion, mistake, or deception to the effect that Smoothie King sponsors or approves of the services that Defendants provide at the Units, all in violation of Paragraph 43(a) of the Lanham Act.

92.     Paragraph 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), provides that "[t]he owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms of the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subparagraph."

93.     Defendants' use of the Smoothie King Marks in connection with goods and services at the Units, after the Smoothie King Marks became famous, has caused and will continue to cause dilution and disparagement of the distinctive quality of the Smoothie King

Marks, and has lessened and will continue to lessen the capacity of the Smoothie King Marks to identify and distinguish the goods and services of Smoothie King, all in violation of Paragraph 43(c) of the Lanham Act.

94.     Defendants' ongoing acts of infringement in violation of Paragraphs 32, 43(a), and 43(c) of the Lanham Act are malicious, fraudulent, willful, and deliberate.

95.     Defendants' ongoing acts of infringement in violation of Paragraphs 32, 43(a), and 43(c) of the Lanham Act have caused and will continue to cause irreparable harm to Smoothie King.

96.     Pursuant to the terms of the Franchise Agreements, Defendants agreed that they would, among other things: (i) immediately and permanently cease to use the Smoothie King Marks upon termination in any manner, (ii) cease immediately operating the Units and not identify or represent that they were operating an Smoothie King Unit or that they were Smoothie King franchisees, and (iii) entitle Smoothie King to seek injunctive or similar relief to enforce Defendants' compliance with ceasing to use the Smoothie King Marks.

97.     Smoothie King has no adequate remedy at law.

98.     No previous injunctive relief has been awarded with respect to this matter or in this case or any other case.

99.     All conditions precedent to Smoothie King's right to recovery for this claim have been performed or have occurred.

## SECOND CLAIM FOR RELIEF
### *Misappropriation of Trade Secrets under the Federal Defend Trade Secrets Act*
*(Against all Defendants)*

100.     Smoothie King realleges and incorporates herein by reference each of the factual allegations above as though fully set forth herein.

101.     The Defend Trade Secrets Act of 2016 ("DTSA"), passed by Congress in August 2016 and effective May 11, 2016, is an amendment to the Economic Espionage Act ("EEA") (18 U.S.C. § 1831 *et seq.*) that creates a federal private cause of action for trade secret misappropriation.  The DTSA provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to produce or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1), as amended by the DEFEND TRADE SECRETS ACT OF 2016, P.L. 114-153, May 11, 2016, 130 Stat. 376.

102.     In addition, the DTSA provides for injunctive relief in a civil action "to prevent any actual or threatened misappropriation . . . on such terms as the court deems reasonable," and treats a continuing misappropriation as a single act.  18 U.S.C. §§ 1836(b)(3)(A)(i), 1836(d). Finally, the DTSA provides that "[t]he district courts of the United States shall have original jurisdiction of civil actions brought under this section."  18 U.S.C. § 1836(c).

103.     Smoothie King is the owner of various trade secrets including: (i) the System; (ii) the contents of the Manuals and of all employee training materials and computer programs developed by Smoothie King or in accordance with its specifications; (iii) product recipes, ingredients, and formulas; (iv) Smoothie King procedures and methods for the preparation of Smoothie King products; (v) Smoothie King-branded products and other proprietary products; (vi) Unit plans and specifications that are works for hire; (vii) menu board designs and graphics; (viii) product identification posters and photographs; (ix) advertising and marketing materials; (x) labels, forms, and reports provided by Smoothie King; (xi) any computer software developed by Smoothie King or as works for hire for use in the operation of Units; (xii) methods of communication between and among Smoothie King and Unit operators; and (xiii) any other

confidential or proprietary information Smoothie King imparts to its franchisees with respect to the Unit's operation or management, whether through the Manuals or otherwise. All of this information also derives independent economic value from not being generally known to or not being reasonably ascertainable by proper means to the public or Smoothie King's competitors. *See* 18 U.S.C. § 1839(3).

104. Smoothie King has taken reasonable measures to protect the secrecy of its trade secrets, including but not limited to causing franchisees to execute franchise agreements containing confidentiality, non-competition, and post-termination provisions. *See* 18 U.S.C. § 1839(3).

105. All of Smoothie King's trade secrets relate to a product and/or service used in interstate or foreign commerce. *See* 18 U.S.C. § 1836(b)(1).

106. Upon information and belief, Defendants have misappropriated Smoothie King's trade secrets, including, without limitation, its recipes, by disclosing and using such trade secrets without Smoothie King's express or implied consent to compete with Smoothie King, all despite Defendants' knowledge that the trade secrets were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use. *See* 18 U.S.C. §§ 1839(5), (6). Upon information and belief, Defendants' misappropriation of Smoothie King's trade secrets began after February 26, 2020, when Smoothie King terminated the Franchise Agreements. Upon information and belief, Defendants' misappropriation is ongoing and continuous.

107. Defendants' use of Smoothie King's trade secrets is causing Smoothie King significant and irreparable harm, including the loss of good will and the dilution of the economic value of Smoothie King intellectual property.

108.     Smoothie King is entitled to injunctive relief under the DTSA as well as monetary damages, exemplary damages, attorneys' fees and costs. *See* 18 U.S.C. §§ 1836(b)(3)(A)-(D).

109.     All conditions precedent to Smoothie King's right to recovery for this claim have been performed or have occurred.

<u>**THIRD CLAIM FOR RELIEF**</u>
*Violations of the Unfair Trade Practices and Consumer Protection Law*
*(Against all Defendants)*

110.     Smoothie King realleges and incorporates herein by reference each of the factual allegations above as though fully set forth herein.

111.     Defendants have misappropriated Smoothie King's trademarks, trade secrets and other confidential and proprietary business information, including recipes, methods and systems contained in Smoothie King's Manuals and recipe boards by failing to de-identify the location, refrain from using Smoothie King's valuable trademarks, and return Smoothie King's trade secrets and other confidential and proprietary business information after the franchise relationship between the parties ended.

112.     The foregoing conduct is unlawful, unethical, unfair and deceitful.

113.     Defendants' actions violatethe Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § 51:1401 (2003) *et seq*. ("LUTPA").

114.     All conditions precedent to Smoothie King bringing this action and its right to recovery have been performed or have occurred.

115.     These actions have directly and proximately caused loss and damage to Smoothie King.

# FOURTH CLAIM FOR RELIEF

### *Breach of the Franchise Agreements*
*(Against all Defendants)*

116.     Smoothie King realleges and incorporates herein by reference each of the factual allegations above as though fully set forth herein.

117.     The Franchise Agreements were valid and enforceable in all respects.

118.     Smoothie King performed its contractual obligations under the Franchise Agreements.

119.     Defendants breached Section 16.1 of the Franchise Agreements by failing to comply with their post-termination obligations, including but not limited to: (i) failing to immediately cease to operate the Units and no longer represent themselves, directly or indirectly, as a current or former franchisee of Smoothie King; (ii) failing to immediately deliver to Smoothie King the Proprietary Materials; (iii) upon information and belief, by failing to immediately and permanently cease to use, in any manner whatsoever, any confidential recipes, formulas, Smoothie King® proprietary products and other ingredients, guest and supplier lists, product specifications lists, methods, procedures, or techniques associated with the System, the name and mark "SMOOTHIE KING®," and all other Marks and distinctive names, symbols, logos, insignia, slogans, graphics, and devices associated with the System, including all signs, advertising materials, displays, stationery, forms, and any other articles that display any of the Marks; and (iv) failing to pay all amounts due under the Franchise Agreements.

120.     Defendants further breached the Franchise Agreements by, among other things, failing to abide by the requirements and obligations related to operating the Units, including using unapproved suppliers.

121.     The Franchise Agreements provide that if any payment is overdue, the amount of the unpaid and past due obligation will bear interest at the lesser of the maximum legal rate or eighteen percent (18%) per annum. Defendants' breaches directly and proximately caused damages and injury to Smoothie King.

## FIFTH CLAIM FOR RELIEF
### *Breach of the Franchise Agreements – Covenant Not to Compete*

122.     Smoothie King realleges and incorporates herein by reference each of the factual allegations above as though fully set forth herein.

123.     The Franchise Agreements were valid and enforceable in all respects.

124.     Smoothie King performed its contractual obligations under the Franchise Agreements.

125.     Defendants breached the Franchise Agreements, which caused Smoothie King to terminate the Franchise Agreements on February 20, 2020.

126.     The covenant not to compete contained in the Franchise Agreements prohibits Defendants from diverting or attempting to divert business from the Units or any other Smoothie King Unit and from engaging in any business that distributes, markets or sells, at wholesale or retail, any nutritional drinks or general nutrition products or any other related business that is competitive with or similar to a Smoothie King Unit that is located at the Unit or within a five (5) mile radius of the Unit or any other Smoothie King Unit in existence or planned as of the time of expiration or termination for a period of two (2) years following termination.

127.     The covenant not to compete is between a franchisor and franchisee; complies with Louisiana law; and serves to protect Smoothie King's legitimate business interests, including, but not limited to, its trade secrets, confidential business information, and its good will and substantial relationships with its franchisees and customers.

128.    Defendants' actions in continuing to operate smoothie businesses from the former Smoothie King Units after termination of the Franchise Agreements constitute breaches of the covenant not to compete provision of the Franchise Agreements.

129.    These actions have directly and proximately caused loss and damage to Smoothie King.

### SIXTH CLAIM FOR RELIEF
***Breach of the Guaranties***
*(Against Defendant Pate)*

130.    Smoothie King realleges and incorporates herein by reference each of the factual allegations above as though fully set forth herein.

131.    The Guaranties are valid and enforceable in all respects.

132.    Smoothie King performed its contractual obligations under the Guaranties.

133.    Pursuant to the Guaranties, Pate unconditionally and irrevocably guaranteed each and every term, covenant, and obligation of Valdosta, Tifton, and Thomasville to Smoothie King under the Franchise Agreements, including the obligation to ensure that Valdosta, Tifton, and Thomasville comply with the operations requirements as to Approved Suppliers as set forth in the Franchise Agreements, make timely payment of operating fees and royalties to Smoothie King, and to comply with the Franchise Agreements' post-termination obligations.

134.    Despite his obligations as guarantor, Pate failed to perform or otherwise require Valdosta, Tifton, and Thomasville's performance under the Franchise Agreements.

135.    Pate's failure to ensure that Defendants operated and maintained the Units in accordance with Smoothie King's operating specifications under the Franchise Agreements and that Defendants comply with the post-termination obligations and covenant not to compete under

the Franchise Agreements constitutes breaches of the Guaranties, and said breaches have directly and proximately damaged Smoothie King.

## SEVENTH CLAIM FOR RELIEF
### *Violation of Louisiana Uniform Trade Secrets Act*
#### *(Against all Defendants)*

136.    Smoothie King realleges and incorporates herein by reference each of the factual allegations above as though fully set forth herein.

137.    This cause of action is brought under the Louisiana Uniform Trade Secrets Act ("LUTSA"). La. Rev. Stat. Ann. § 51:1431, *et seq*.

138.    Smoothie King has trade secrets, including, without limitation, confidential and proprietary recipes and blending techniques for making healthful, blended, fruit drinks. Smoothie King derives independent economic value from these trade secrets not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.  These trade secrets are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

139.    Upon information and belief, Defendants misappropriated these trade secrets, by disclosing and using these trade secrets by using improper means to acquire knowledge of the trade secrets, and at the time of disclosure or use, they knew or had reason to know that the knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use and/or derived from or through a person who owed a duty to Smoothie King to maintain its secrecy or limit its use.

140.    Smoothie King has taken more than adequate measures, under the circumstances, to maintain the secrecy of the proprietary and confidential information above-described,

including by having Defendants sign agreements requiring that such information be kept confidential, and not disclosed to third parties.

141. Defendants' wrongful use or disclosure of the confidential information and trade secrets of Smoothie King has, and will continue to, seriously damage Smoothie King in an amount that is not presently ascertainable.

142. Because Defendants will continue their acts of misappropriation or threatened misappropriation of Smoothie King's confidential information and trade secrets, which will irreparably injure Smoothie King, Smoothie King requests that the Court enjoin Defendants' improper activities.

143. Pursuant to La.R.S. 51:1432, Smoothie King is entitled to an order, preliminarily and permanently enjoining Defendants from further misappropriation of Smoothie King's trade secrets, to eliminate their unfair commercial advantage.

144. Pursuant to La.R.S. 51:1433, Smoothie King is entitled to recover damages from Defendants, for the actual losses caused by their trade secret misappropriation, and any unjust enrichment Defendants have derived their use that is not taken into account in computing the damages for actual loss.

### EIGHTH CLAIM FOR RELIEF
*Accounting*
*(Against all Defendants)*

145. Smoothie King realleges and incorporates herein by reference each of the factual allegations above as though fully set forth herein.

146. Pursuant to Section 11 of the Franchise Agreements, Smoothie King is entitled to an accounting of all amounts owed to it from Defendants.

147. Defendants owe Smoothie King fees under the Franchise Agreements in an exact amount unknown to Smoothie King and which cannot be ascertained without an accounting of the receipts and disbursement, profits and loss statements, and other financial materials, statements, and books from Defendants.

## NINTH CLAIM FOR RELIEF
*Attorneys' Fees*
*(Against all Defendants)*

148. Smoothie King realleges and incorporates herein by reference each of the factual allegations above as though fully set forth herein.

149. Pursuant to Section 25.3 of the Franchise Agreements, the prevailing party is entitled to recover its reasonable attorneys' fees, court costs, and expenses incurred in connection with enforcing the terms and provisions of the Franchise Agreements.

150. Smoothie King has retained counsel and is entitled to attorneys' fees under the Franchise Agreements. Smoothie King has incurred and continues to incur reasonable and necessary attorneys' fees together with court costs and litigation expenses. Smoothie King seeks its attorneys' fees, together with court costs.

## PRAYER FOR RELIEF

Wherefore, Smoothie King prays the Court provide relief as follows:

1. That the Court preliminary and permanently restrain and enjoin Defendants and their agents, servants, employees, attorneys and other persons in active concert or participation with them, from:

      a. any and all further unauthorized use of the Smoothie King Marks, and any other word, term, symbol, device or identifying characteristics of the Smoothie King System in connection with Defendants' goods or services;

b.      making in any manner whatsoever any statement of representation, or performing any act, likely to lead members of the public to believe that Defendants, the Units and the products and services provided therein, are in any manner, directly or indirectly, associated, affiliated, or connected with, or licensed, sponsored, authorized or approved by Smoothie King; and

c.      diluting the distinctiveness of the Smoothie King Marks and otherwise injuring Smoothie King's reputation in any manner.

2.      That the Court preliminarily and permanently restrain and enjoin Defendants, and their principals, agents, servants, employees, attorneys and other persons in active concert engaging in any business that distributes, markets, or sells, at wholesale or retail, any nutritional drinks or general nutrition products or any other related business that is competitive with or similar to a Smoothie King Unit that is located at its former Smoothie King Units or within a five (5) mile radius of Defendants' former Smoothie King Units or any other Smoothie King Unit in existence or planned as of the termination of Defendants' Franchise Agreements until two (2) years have passed from the date of entry of the Order of this Court granting the requested injunction;

3.      That the Court permanently restrain and enjoin Defendants, and their principals, agents, servants, employees, attorneys and other persons in active concert or participation with them from disclosing and continuing to use any of Smoothie King's trade secret information.

4.      That the Court order Defendants to destroy, remove or return to Smoothie King all advertising and promotional materials, signage, wall graphics, menus, bags, cups, uniforms, stationery, envelopes, business cards, invoices and similar materials bearing any of the Smoothie King Marks or colorable imitations thereof;

5.     That Defendants are required to comply with all of the post-termination obligations under the Franchise Agreements and the Guarantees, including but not limited to ceasing use of the Smoothie King Marks, returning all of Smoothie King's Proprietary Materials including all Manuals to Smoothie King, ceasing use of all telephone numbers that are or have been listed in telephone directories under the name SMOOTHIE KING, and transferring the same to Smoothie King or its designee, and paying all outstanding amounts due Smoothie King;

6.     That Smoothie King recover of Defendants monetary damages consistent with the Lanham Act, Defend Trade Secrets Act, and/or any applicable state law including, without limitation, compensation for Smoothie King's damages, Defendants' profits or other financial benefits from their trademark infringement, unfair competition, misappropriation of trade secrets, and breach of contract, all in amounts to be determined at trial;

7.     That the costs of this action, including a reasonable attorneys' fee for Smoothie King's attorneys, be taxed against Defendants;

8.     That Smoothie King be awarded pre- and post-judgment interest; and

9.     That the Court grant Smoothie King such other and further relief, both general and specific, as the Court may deem just and proper.

Date: March 6, 2020

Respectfully submitted,


<table>
<tr><td>KILPATRICK TOWNSEND &<br>    STOCKTON LLP<br>1100 Peachtree Street, Suite 2800<br>Atlanta, Georgia 30309<br>Phone: (404) 815-6500<br>Fax: (404) 815-6555</td><td>/s/ Tayah Woodard<br>John P. Jett, GA Bar No. 827033<br>Tayah Woodard, GA Bar No. 312548<br>jjett@kilpatricktownsend.com<br>twoodard@kilpatricktownsend.com<br><br>*Counsel for Plaintiff*</td></tr>
</table>

Will apply for admission pro hac vice
Deborah S. Coldwell
Texas Bar No. 04535300
deborah.coldwell@haynesboone.com
Sally L. Dahlstrom
sally.dahlstrom@haynesboone.com
Texas Bar No. 24092314
Daley R. Epstein
daley.epstein@haynesboone.com
Texas Bar No. 24113645

2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Telephone: (214) 651-5260
Facsimile: (214) 651-5940

**ATTORNEYS FOR PLAINTIFF
SMOOTHIE KING FRANCHISES, INC.**

## <u>VERIFICATION</u>

STATE OF TEXAS        §
                                       §
COUNTY OF DALLAS    §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Kevin King, who after being by me first duly sworn, deposed and stated as follows:

1.      I am over the age of eighteen (18) years, am of sound mind and am otherwise qualified and capable to make this Verification.

2.      I am the Chief Development Officer for Smoothie King Franchises, Inc. ("Smoothie King").  I am authorized to make this verification on behalf of Smoothie King.

3.      I have read the foregoing Verified Complaint and the allegations contained therein.  The factual allegations contained in the Verified Complaint are true and correct based on my personal knowledge, the records of Smoothie King and/or information available through employees and agents of Smoothie King.

4.      I am also the designated custodian of records of Smoothie King.  Attached to this Verified Complaint are Exhibits A – J.  These attached records are kept by Smoothie King in the regular course of business, and it was the regular course of business of Smoothie King for an employee or representative of Smoothie King with knowledge of the act, event, condition, or opinion recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter.  The records attached hereto are exact duplicates of the originals.

_____
Kevin King

SWORN TO AND SUBSCRIBED before me this ___6th___ day of March, 2020.

_____
Notary Public

(PERSONALIZED SEAL)



TERESA LOPEZ
Notary Public, State of Texas
Comm. Expires 11-06-2021
Notary ID 131324887

## VERIFICATION

STATE OF GEORGIA       §
                             §
COUNTY OF HOUSTON    §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Danielle E. LeVine who after being by me first duly sworn, deposed and stated as follows:

1.      I am over the age of eighteen (18) years, am of sound mind and am otherwise qualified and capable to make this Verification.

2.      I am a fully insured and licensed private investigator, License # PDE048525, in the State of Georgia for Hawk Professional Investigations, License # PDC000918, that employs a team of licensed professional investigators to provide customers with investigatory and surveillance services. The facts set forth in this Verification are based on my own personal knowledge by virtue of my position, including, without limitation my knowledge of the records of Hawk Professional Investigations and/or information available through employees and agents of Hawk Professional Investigations with whom I work.

3.      I was hired by Kilpatrick Townsend & Stockton LLP, on behalf of Smoothie King Franchises, Inc. ("Smoothie King"), to visit and photograph three (3) Smoothie King units in Georgia.

4.      On March 2, 2020, I visited the Smoothie King unit located at 3219 N Oak Street Extension, Valdosta, Georgia 31605 (the "Valdosta Unit"). The exterior Smoothie King sign was still being displayed at the Valdosta Unit and the Valdosta Unit was still selling smoothies. True and correct copies of the report I prepared, the photographs I took, and the sales receipt I acquired from the Valdosta Unit on March 2, 2020 are attached to this Verified Complaint as Exhibit "K" at pages 11-20.

5. On the same day, I visited the Smoothie King unit located at 406 Virginia Ave N, Tifton, Georgia 31793 (the "Tifton Unit"). The exterior Smoothie King sign was still being displayed at the Tifton Unit and the Tifton Unit was still selling smoothies. True and correct copies of the report I prepared and the photographs I took at Tifton Unit on March 2, 2020 are attached to this Verified Complaint as Exhibit "K" at pages 2-8.

6. On the same day, I visited the Smoothie King unit located at 14949 US Hwy 19 South, Suite A, Thomasville, Georgia 31792 (the "Thomasville Unit"). The exterior Smoothie King sign was still being displayed at the Thomasville Unit. True and correct copies of the report I prepared and the photographs I took of the Thomasville Unit on March 2, 2020 are attached to this Verified Complaint Exhibit "K" at pages 8-10.

7. I am also a designated custodian of records of Hawk Professional Investigations. The records attached to this Verified Complaint as Exhibit "K" are kept by Hawk Professional Investigations in the regular course of business, and it was the regular course of business of Hawk Professional Investigations for an employee or representative of Hawk Professional Investigations with knowledge of the act, event, condition, or opinion recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto as Exhibit "K" are exact duplicates of the originals.

_____
Danielle E. LeVine

SWORN TO AND SUBSCRIBED before me this __5__ day of March 2020.

_Emily Wilkerson_
Notary Public



(PERSONALIZED SEAL)